THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| BATISTA-ACEVEDO, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> **PRESBYTERIAN COMMUNITY HOSPITAL, INC.**, *et al.*, <br><br> *Defendants*. | Civ. No. 22-01468 (MAJ) |

**OPINION AND ORDER**

I. **Introduction**

On September 27, 2022, Plaintiffs Aislyn Batista Acevedo, Ina Ruth Kessler Krugman, and minor ADSB ("Plaintiffs") filed the instant suit on behalf of the late David Suárez ("Suárez") against Ashford Presbyterian Hospital ("Ashford Hospital" or "Ashford"), Doctors' Center Hospital Bayamón ("Doctors' Center"), and various other Defendants ("Defendants"). (**ECF No. 1**). Plaintiffs then filed an Amended Complaint and the present, operative Second Amended Complaint (hereinafter "the Complaint"). (**ECF Nos. 224 and 288**). Plaintiffs allege that during Suárez's medical treatment from September 29, 2021, until his passing on October 23, 2021, Ashford Hospital and Doctors' Center failed to screen and stabilize him in violation of the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395. (**ECF No. 288 ¶¶ 1, 208, 221, 231**). Plaintiffs further allege that all Defendants are liable under 31 L.P.R.A. §§ 10801 and 10806 of Puerto Rican state law for negligence and medical malpractice during the time

that led to Suárez's death.[1] *Id*. ¶¶ 1, 222-229, 238. Plaintiffs are seeking damages in the amount of at least $29,030,000. *Id*. ¶¶ 230-38.

Presently before the Court is the Motion to Dismiss ("Motion") filed by Defendant Dr. Francisco Feliciano-Chaves ("Dr. Feliciano"). (**ECF No. 290**). The Motion is joined by other Defendants namely, Dr. Carlos C. Key-Oyola; Dr. José Colón-Avilés; Dr. Eugenio J. Toro-Torres; Dr. Víctor J. Rivera-Cruz; Dr. Vasco Eguía-Moreda; Dr. José Rentas-Monroig; Allure, LLC; Luis Roa Cordero; Puerto Rico Medical Defense Insurance Company; Aspen American Insurance Company; Dr. Rubén D'Acosta-Lugo and Conjugal Partnership; Suzette Betancourt-Reyes and Conjugal Partnership with Luis Roa Cordero; Dr. Michelle S. Avilés-Pérez; Dr. Charles Cuff-Negroni; and Dr. Esteban Ramos-Álvarez (collectively with Dr. Feliciano, "Movants"). (**ECF Nos. 291, 293, 294, 299, 301, 302, 305, 306, 307, 308, 313, 315, 316, 322, 323, 334**). Plaintiffs have filed a Memorandum in Opposition. (**ECF No. 328**).

Movants argue for dismissal on the following grounds: (1) The Court should dismiss any EMTALA claims against the treating physicians under Fed. R. Civ. P. 12(b)(6) because EMTALA provides no cause of action against or jurisdiction over treating physicians; (2) the Court should decline to exercise its supplemental jurisdiction over the treating physicians for the medical malpractice claims under Puerto Rico law; and (3) Plaintiffs have alleged insufficient facts against Dr. Feliciano, so the Court should dismiss

---

[1] Under 28 U.S.C. § 1367(e) "the term 'State' includes . . . the Commonwealth of Puerto Rico" and will be referred to as such for the purposes of this Opinion and Order. *Pérez Arritola v. García Muñiz*, 22-cv-01507, 2023 U.S. Dist. LEXIS 52202, at *2 n.1 (D.P.R. Mar. 27, 2023) (citing 28. U.S.C. § 1367(e)).

all claims against him under Fed. R. Civ. P. 12(b)(6).[2] (**ECF No. 290 at 2-3, 6-8**). For the reasons stated below, the Court **DENIES** Movants' Motion to Dismiss.

## II.     Factual Background

The facts—as per the allegations in the Complaint—are as follows: Plaintiffs, Suárez's mother, son, and live-in partner, bring this action on his behalf. (**ECF No. 288 ¶¶ 4-6**). Suárez had a medical history of gallbladder stones and high blood pressure. *Id.* ¶ 107.

On September 29, 2021, Suárez arrived at Ashford Hospital's emergency room with symptoms of abdominal pain. *Id.* Tests throughout the night allegedly discovered gallbladder disease, and the following morning, Defendant Dr. Cuff discussed with Suárez the need to undergo surgery. *Id.* ¶¶ 109-12. However, Defendant Dr. Cuff declined to perform surgery until Suárez could get tested via either a magnetic resonance cholangiopancreatography ("MRCP"), or an evaluation for a probable endoscopic retrograde cholangiopancreatography ("ERCP").[3] *Id.* ¶ 113. Despite this decision, the only test performed that day was a bilirubin test, which thereafter hemolyzed.[4] *Id.* ¶ 114.

---

[2]     Other Defendants joined the Motion to Dismiss, arguing that "EMTALA does not apply to the treating physicians," and would allow for dismissal of all doctors for lack of jurisdiction if true. (**ECF No. 290 at 2**). However, as for failure to state a claim under 12(b)(6), the motion only argued why Plaintiffs' allegations were insufficient as to Dr. Feliciano. (**ECF No. 290 at 3**). The joining parties did not argue why the allegations, of which there are many, would be insufficient to state a claim against them specifically. (**ECF Nos. 291, 293, 294, 299, 301, 302, 305, 306, 307, 308, 313, 315, 316, 322, 323, 334**). Therefore, the Court will only address the argument as to insufficient allegations concerning the claims brought against Dr. Feliciano.

[3]     An MRCP is an exam that uses a magnetic resonance imaging ("MRI") machine, which uses a magnetic field, radio waves, and a computer to evaluate the liver, gallbladder, bile ducts, pancreas, and pancreatic duct. Radiological Soc'y of N. Am., Inc. (RSNA), *MRCP (MR Cholangiopancreatography)*, RadiologyInfo.Org, https://radiologyinfo.org/en/info/mrcp (last updated April 15, 2022).
        ERCP "is a procedure that combines upper gastrointestinal . . . endoscopy and x rays to treat problems of the bile and pancreatic ducts." *Rivera-Vazquez v. Hospital General Menonita*, 10-cv-1071, 2012 WL 3679541, at *9 n.8.

[4]     Hemolyzed samples have effectively "spoiled." *House v. Bell*, 547 U.S. 518, 543 (2006).

Though fresh samples were allegedly needed to replace the ones that had hemolyzed, further blood samples were not taken that day. *Id.* ¶¶ 114, 127.

That same day, Defendant Dr. Ramos also allegedly recommended an MRCP on Suárez's medical report to rule out choledocholithiasis, an emergency medical condition that can be life threatening if not treated promptly and appropriately.[5] *Id.* ¶ 115. Thereafter, Defendant Dr. Cuff documented that MRCP was not an option because of Suárez's obesity, and he would instead have to be transferred to an institution that was more equipped to handle patients of his build. *Id.* ¶ 120. Defendant Dr. Álvarez allegedly informed Suárez of the need for transfer but did not document this in Suárez's medical record. *Id.* ¶ 122.

From 9:15 pm on September 30, 2021, until 4:13 am on October 1, 2021, Dr. Feliciano was the only doctor noted to have treated Suárez. *Id.* ¶¶ 122-25. During this period, Dr. Feliciano allegedly ordered Suárez medications without making any progress notes in his medical record. *Id.* ¶ 123. At 2:06 am on October 1, 2021, nurses documented that Suárez was sweaty, nauseous, and suffering from respiratory distress, though it was not documented that Dr. Feliciano, or any other physician, was informed. *Id* ¶ 124. Suárez's pain—despite having been administered pain medications—was allegedly not discovered until the next doctor took over his care, who then ordered more. *Id.* ¶¶ 125. Thereafter the hemolyzed tests were finally repeated, and Suárez's vital signs were found to have worsened. *Id.* ¶¶ 127-28, 130.

Suárez remained at Ashford Hospital until that afternoon when he was transferred to Doctors' Center. *Id.* ¶¶ 140-41. Without MRCP or ERCP being considered by Doctors'

---

[5] Choledocholithiasis "means stones in the common bile duct." *Casillas-Sanchez v. Ryder Mem'l Hosp., Inc.*, 14 F. Supp. 3d 22, 25 (D.P.R. 2014).

Center's medical staff, Suárez was transferred back to Ashford Hospital on October 2. *Id.* ¶¶ 159, 162. Doctors at Ashford consistently documented that Suárez would not fit into the hospital's CT scan or MRI machines, making any abdominal imaging impossible.[6] *Id.* ¶¶ 182-84. It was allegedly not until October 12 that a doctor finally contacted Ashford's imaging center and found that the CT machines there could hold up to 450 pounds, 100 pounds more than Suárez's weight. *Id.* ¶ 186. By then, Suárez was too unstable to be moved for a CT scan. *Id.* ¶ 187.

After spending weeks at Ashford Hospital, Suárez died on October 23, 2021. *Id.* ¶ 191. Plaintiffs allege that throughout that time, and although he had been in the care of Dr. Feliciano and others, Suárez never received MRCP, ERCP, or surgery, though all had been deemed necessary for his documented emergency conditions. *Id.* ¶¶ 192-95. According to progress notes, Suárez "responded to pain until the day he died." *Id.* ¶ 196.

### III. Standard of Review

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), federal courts use a two-step method based on the plausible, not just possible standard set forth in *Twombly* and *Iqbal*. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Under this approach, a court must first "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements." *Schatz v. Republican State Leadership Committee*, 669 F.3d 50, 55 (1st Cir. 2012). A complaint does not need detailed factual allegations, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere

---

[6] A computed tomography ("CT") scan uses x-rays and computer processing to generate cross-sectional imagery. *Guay v. Sig Sauer, Inc.*, 610 F. Supp. 3d 423, 429 n.1 (D.N.H. 2022) (citing *Computed Tomography*, Stedman's Medical Dictionary (2014)).

conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. A court need not "credit conclusory legal allegations nor factual allegations that are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture." *Legal Sea Foods, LLC v. Strathmore Insurance Co.*, 36 F.4th 29, 33 (1st Cir. 2022) (internal citations and quotations omitted).

Second, the court must then "take the complaint's well-[pleaded] (i.e., non-conclusory, non-speculative) facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief." *Schatz*, 669 F.3d at 55. (first citing *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 14 (1st Cir. 2011); and then citing *S.E.C. v. Tambone*, 597 F.3d 436, 441–42 (1st Cir. 2010)). "Plausible, of course, means something more than merely possible, and gauging a pleaded situation's plausibility is a 'context-specific' job that compels [the court] 'to draw on' its 'judicial experience and common sense.'" *Id*. (citing *Iqbal,* at 678-79). This "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. *Twombly*, 550 U.S. at 545, 556.

The First Circuit Court of Appeals has held that a "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Ocasio-Hernández*, 640 F.3d at 14 (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)). The First Circuit explained that the "make-or-break standard" for determining whether a complaint states a claim is whether "the combined allegations, taken as true . . . state a plausible, not merely conceivable, case for relief." *Ocasio-Hernández*, at 12 (quoting *Sepúlveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 39 (1st Cir. 2010)). *Ocasio-Hernández* makes it clear that plaintiffs are not required to allege every single fact that supports their claim in their complaint. *Id*. at 13. "In short,

an adequate complaint must provide fair notice to the defendants and state a facially plausible legal claim." *Id.* at 12.

"A complaint that rests on 'bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like' will likely not survive a motion to dismiss." *Niagara Bottling, LLC v. CC1 LP*, 381 F. Supp. 3d 175, 181 (D.P.R. 2019) (quoting *Aulson v. Blanchard*, 83 F.3d 1, 3 (1st Cir. 1996)). Similarly, unadorned factual assertions as to the elements of the cause of action are inadequate as well. *Peñalbert-Rosa v. Fortuño-Burset,* 631 F.3d 592, 595 (1st Cir. 2011). "[P]ure speculation is not" given credit at the motion to dismiss phase. *Peñalbert-Rosa*, 631 F.3d at 596; *see also Méndez Internet Mgmt. Servs. v. Banco Santander de P.R.,* 621 F.3d 10, 14 (1st Cir. 2010) (*Twombly* and *Iqbal* standards require district courts to "screen [] out rhetoric masquerading as litigation.").

## IV. Applicable Law and Analysis

Movants make three arguments for dismissal: (1) EMTALA provides no cause of action against or jurisdiction over treating physicians; (2) the Court should therefore decline to exercise its supplemental jurisdiction over the medical malpractice claims under Puerto Rico law; and (3) Plaintiffs failed to allege sufficient facts against Dr. Feliciano to establish a cause of action. (**ECF No. 290 at 2-3, 6-8**). Each argument will be addressed in turn.

### a. Emergency Medical Treatment and Labor Act

Beginning with Movants' first argument, EMTALA is "designed to prevent *hospital emergency rooms* from 'refusing to accept or treat patients with emergency conditions if the patient does not have medical insurance.'" *Alvarez-Torres v. Ryder Mem'l Hosp., Inc.*, 582 F.3d 47, 51 (1st Cir. 2009) (emphasis added) (quoting *Correa v. Hosp. San*

*Francisco*, 69 F.3d 1184, 1189 (1st Cir. 1995)). It "imposes duties on covered [medical] facilities to: (a) provide an 'appropriate medical screening examination' for those who come to an emergency room seeking treatment, and (b) provide, in certain situations, 'such further medical examination and such treatment as may be required to stabilize the medical condition.'" *Alvarez-Torres*, 582 F.3d at 51 (quoting 42 U.S.C. §§ 1395dd(a), (b)(1)(A)) (citing *López-Soto v. Hawayek*, 175 F.3d 170, 172-73 (1st Cir. 1999)). Notably, the first element of an EMTALA claim is that "the *hospital* is a participating hospital, covered by EMTALA, that operates an emergency department (or an equivalent treatment facility)." *Correa*, 69 F.3d at 1190 (citations omitted). Accordingly, EMTALA claims are limited to hospitals, not treating physicians. *Pujol-Alvarez v. Grupo HIMA-San Pablo, Inc.*, 249 F. Supp. 3d 591, 597-98 (D.P.R. 2017) (citing 42 U.S.C. § 1395dd(d)–(2)–(A)); *Alvarez-Torres v. Ryder Mem'l Hosp., Inc.*, 576 F. Supp. 2d 278, 285 (D.P.R. 2008), *aff'd*, 582 F.3d 47 (1st Cir. 2009).

As mentioned, Movants argue that "EMTALA does not authorize a private cause of action against the treating physicians," and as such, the EMTALA claims against them should be dismissed. (**ECF No. 290 at 6-7**). Movants are correct that EMTALA does not apply to them. However, Plaintiffs do not allege EMTALA claims against the treating physicians named in this suit. (**ECF No. 288**). Instead, Plaintiffs allege that "because of *Ashford's and Doctors'* EMTALA violations, [Suárez] suffered extreme physical pain and mental suffering . . . until he finally died prematurely." *Id.*¶ 231 (emphasis added). The mention of "Doctors" is in reference to Doctors' Center, not the treating physicians or "doctors," as Movants contend. *Id.* ¶ 8. Plaintiffs clarify as much by explicitly stating that they "have not asserted in their . . . Complaint a cause of action under EMTALA against the individual physicians." (**ECF No. 328 at 7**). This comes after Plaintiffs already

informed Movants that the EMTALA claims are only being directed towards the defendant hospitals twice, in past memorandums. (**ECF No. 135 at 6-7**); (**ECF No. 255 at 6-8**). Accordingly, the Court finds that there are no EMTALA claims being brought against any of the Movants. As such, their Motion to Dismiss as to this point is **DENIED**.[7]

### b. Supplemental Jurisdiction over Medical Malpractice Claims Under Puerto Rico Law

Movants next argue that the Court should decline to exercise its supplemental jurisdiction over the Puerto Rico law claims brought against them, because the case would be "much simpler and faster to conclude." (**ECF No. 290 at 2**). Plaintiffs disagree, arguing that this Court has exercised jurisdiction over Puerto Rico malpractice claims in cases involving EMTALA claims in the past. (**ECF No. 328 at 8-13**). In so arguing, Plaintiffs contend that the Puerto Rico law claims against the Movants stem from the same nucleus of operative facts as the EMTALA claims against the defendant hospitals. *Id*.

"[U]nder 28 U.S.C. § 1367, federal courts may exercise 'supplemental' jurisdiction over state-law claims linked to a claim based on federal law." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 506 (2006). However, federal district courts are provided "supplemental jurisdiction over only those claims 'that are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under

---

[7] In the alternative, Plaintiffs argue Movants may actually be seeking dismissal under 12(b)(1) for lack of jurisdiction. (**ECF No. 328 at 2**). Courts have cautioned not to conflate an attack against the elements of a federal claim with an argument for dismissal for lack of jurisdiction. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 511 (2006) (citations omitted); *Cruz-Vazquez v. Mennonite Gen. Hosp., Inc.*, 717 F.3d 63, 67-68 (1st Cir. 2013) (citations omitted); *Ortega-Santos v. San Francisco Health Sys., Inc.*, 494 F. Supp. 3d 88, 91-92 (citations omitted). To the extent Movants argue this Court lacks original jurisdiction over them under EMTALA, they would be correct for the reasons stated above. Regardless, the Court retains pendent-party jurisdiction over Movants, as discussed below.

Article III.'" *Sevelitte v. Guardian Life Ins. Co. of Am.*, 55 F.4th 71, 86 (1st Cir. 2022) (quoting 28 U.S.C. § 1367 (a)). Accordingly, claims that may be heard under supplemental jurisdiction must "'derive from a common nucleus of operative fact' with the claim satisfying original jurisdiction." *Sevelitte*, 55 F.4th at 86 (quoting *Allstate Interiors & Exteriors, Inc. v. Stonestreet Constr., LLC*, 730 F.3d 67, 72 (1st Cir. 2013)).

Under 28 U.S.C. § 1367(a), Courts may exercise "pendent party jurisdiction" to exercise supplemental jurisdiction between federal claims brought against one defendant, and state claims brought against another defendant, when they arise out of the same facts. *Millan v. Hosp. San Pablo*, 389 F. Supp. 2d 224, 236 n.6 (D.P.R. 2005) (quoting Erwin Chemerinski, *Federal Jurisdiction* 338-41 (Aspen Publishers, 4th ed. 2003)).

Even where a court dismisses all federal claims, it looks first to "the interests of fairness, judicial economy, convenience, and comity" to decide whether to exercise supplemental jurisdiction. *Lambert v. Fiorentini*, 949 F.3d 22, 29 (1st Cir. 2020) (quoting *Camelio v. Am. Fed'n*, 137 F.3d 666, 672 (1st Cir. 1998)). Courts further judicial economy when they exercise supplemental jurisdiction over claims that arise from the same core facts as claims of original jurisdiction, resolving multiple related matters at once. *Redondo Constr. Corp. v. Izquierdo*, 662 F.3d 42, 49 (1st Cir. 2011) (citing *Tomaiolo v. Mallinoff*, 281 F.3d 1, 11 (1st Cir. 2002)).

As determined, there are no EMTALA claims being brought against the Movants. (**ECF No. 328 at 6-8**). However, there are still pending EMTALA claims against Ashford Hospital and Doctors' Center, which no parties have moved to dismiss. (**ECF No. 288 ¶¶ 197-221**). Movants contend that the lack of a federal claim against them allows the Court to determine whether it wishes to exercise supplemental jurisdiction over the pending claims under Puerto Rico law. (**ECF No. 290 at 7**). Accordingly, Dr. Feliciano—

and Movants, by way of their Motions for Joinder—request the Court "not exercise supplemental jurisdiction as to the local medical malpractice claims alleged as to him and the other fifteen physicians." *Id.* at 8. In so requesting, Movants argue that the case at hand would be "simpler and faster to conclude." *Id.* at 2.

Movants' arguments are not persuasive. Plaintiffs have alleged that the actions and inactions of the various medical specialists across weeks of hospitalization leading to Suárez's death, give rise to both the EMTALA claims against the hospitals for lack of appropriate medical care, and the Puerto Rico law claims for malpractice and negligence. (**ECF No. 288 ¶¶ 106-197, 210, 222**). Thus, the acts or omissions by Defendant physicians arise from the same facts that implicate EMTALA liability.

Moreover, Courts have repeatedly found common facts and exercised supplemental—that is, pendent party—jurisdiction over medical malpractice claims arising out of the same incidents as EMTALA claims. *See Morales-Ramos v. Hosp. Episcopal San Lucas Guayama, Inc.*, 261 F. Supp. 3d 122, 134-35 (D.P.R. 2016) ("Because the negligence claims against the Hospital and Dr. Matos arise from the same nucleus of operative facts as the EMTALA screening claim, supplemental jurisdiction may be, and will be, exercised over plaintiff's state-law claims." (citing *Hart v. Mazur*, 903 F. Supp. 277, 281 (D.R.I. 1995))); *Millan*, 389 F. Supp. 2d at 237 ("[A]lthough there is no cause of action under EMTALA against the . . . physicians and/or physician's medical corporation, the court has supplemental 'pendent party jurisdiction' because there exists a common nucleus of operative facts present as to the potential cause of action against the defendant physicians."); *Alvarez Torres v. Ryder Mem'l Hosp., Inc.*, 308 F. Supp. 2d 38, 42 (D.P.R. 2004) ("Although there is no cause of action under EMTALA against surgeons and/or physicians, the court has supplemental 'pendent party jurisdiction'" due to remaining

EMTALA claims against co-defendants "and hence the request to dismiss and miscellaneous relief . . . are denied." (emphasis removed)); *Hart*, 903 F. Supp. at 281 ("[T]he Court, having jurisdiction over [plaintiff's] EMTALA claims against Newport Hospital . . . will exercise its supplemental jurisdiction . . . over all state-law claims against the Hospital, [a doctor], and' . . . a physician's assistant.").

Moreover, declining to exercise supplemental jurisdiction would lead to a dismissal without prejudice. *Rodríguez-Rivas v. Police Dep't of P.R.*, 483 F. Supp. 2d 137, 139-40 (1st Cir. 2007) (quoting *United Mines Workers v. Gibbs*, 383 U.S. 715, 726 (1966)) (citing *Martínez v. Colón*, 54 F.3d 980, 990 (1st Cir. 1995)). If Plaintiffs then wished to pursue both their federal and state claims, they would have to address the matter of Suárez's death in both this Court and Puerto Rican state court. This would prove particularly laborious given that dozens of parties have been summoned to federal court over the course of a year for the instant matter, with over 300 filings submitted to the docket thus far. (**ECF Nos. 1-372**). In sum, the interests of judicial economy, convenience, and comity would be best served by continuing to dispose of all claims related to the incident of Suárez's hospitalization at once. (**ECF No. 288**). Accordingly, the Court finds that judicial economy favors exercising supplemental—or pendent party—jurisdiction.

### c. Failure to State a Claim

Finally, Dr. Feliciano argues that Plaintiffs' allegations fail to state a claim for medical malpractice against him under 12(b)(6). (**ECF No. 290 at 2-3**). In so arguing, Dr. Feliciano contends that the only allegation in the Complaint directed to him is: "[D]efendant Dr. Feliciano, emergency room physician, ordered [Suárez] some medications." (**ECF No. 290 at 3**) (quoting (**ECF No. 288 ¶ 123**)). Accordingly,

Defendant Dr. Feliciano alleges that Plaintiffs' allegations are too "vague and insufficient to establish a cause of action" against him.[8] (**ECF No. 290 at 3**).

In response, Plaintiffs argue that the totality of the facts point to Dr. Feliciano having contributed to Suárez's death, and that Dr. Feliciano's actions fell below the requisite standard of care. (**ECF No. 328 at 15-16**). Plaintiffs allege that although Suárez's risk of emergency conditions, need for tests, and worsening state were all documented, Dr. Feliciano's only reported intervention was to order some medications, without making any medical progress on the record. (**ECF No. 288 ¶¶ 112-115, 122-25, 133**). Plaintiffs further allege that despite having been under Dr. Feliciano's care, Suárez never received scans nor the surgery for his emergency medical conditions before his death. *Id.* ¶¶ 191-95.

To establish a plausible claim of medical malpractice, Plaintiffs must allege sufficient facts for the court to reasonably infer that Dr. Feliciano: (1) owed a duty to Suárez that was (2) breached (3) in such a fashion that caused him harm. *Calderón Amézquita v. Rivera Cruz*, 483 F. Supp. 3d 89, 116-17 (D.P.R. 2020) (quoting *Marcano-Rivera v. Turabo Medical Center Partnership*, 415 F.3d 162, 167 (1st Cir. 2005)). "In Puerto Rico, a physician's duty owed to a patient is '[t]hat [level of care] which, recognizing modern means of communication and education, . . . meets the professional requirements generally acknowledged by the medical profession." *Vélez v. Metro Santurce, Inc.*, 950 F. Supp. 2d 349, 351 (D.P.R. 2013) (quoting *Morales v. Monagas*, 723 F. Supp. 2d 411, 415 (D.P.R. 2010)). Notably, this district has found a plaintiff "[a]lleging that the patient's death was because of defendant's failure to assess plaintiff's [treatment]

---

[8] As a reminder, the Court will only address the argument as to insufficient allegations concerning the claims brought against Dr. Feliciano.

or to order timely [treatment] is enough for [a] claim to cross from the realm of possibility to that of plausibility," meeting the standard. *Vélez*, 950 F. Supp. 2d at 351.

Moreover, a plaintiffs' claim is plausible if "the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, at 678 (citing *Twombly*, at 556). The Court must draw all reasonable inferences in a plaintiffs' favor at the pleading stage of the proceedings. *Schatz*, at 55 (first citing *Ocasio-Hernández*, at 12; and then citing *S.E.C.*, 597 F.3d at 441–42). Finally, the Court should consider "*all* the facts alleged, . . . in the light most favorable to the plaintiffs" in a plaintiff's complaint, as the "complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Ocasio-Hernández*, at 14 (quoting *Braden,* 588 F.3d at 595). "Even though no individual allegation established the duty of physicians in similar circumstances to [a defendant doctor], a reading of the complaint *in toto* points to what that duty is; 'there need not be a one-to-one relationship between any single allegation and a necessary element of the cause of action.'" *Vélez*, at 351 (quoting *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 55 (1st Cir. 2013))).

Reading the Complaint as a whole, the Court can reasonably infer that Dr. Feliciano owed a duty of care to Suárez which he breached, and which ultimately caused harm. Dr. Feliciano was the only doctor responsible for Suárez from September 30, 2021, to October 1, 2021. (**ECF No. 288 ¶¶ 122-25**). It is therefore plausible at this juncture that Dr. Feliciano owed a duty to Suárez as a patient under his care. *Vélez*, at 351. While under his care, Dr. Feliciano allegedly did not order replacements for Suárez's hemolyzed tests, as they were allegedly ordered after his shift. (**ECF No. 288 ¶¶ 127-28**). Instead, Plaintiffs allege that Dr. Feliciano ordered medications that did not stop Suárez's

condition from degrading and made no progress notes regarding the medications. *Id.* ¶¶ 123, 128. Moreover, Dr. Feliciano allegedly did not order Suárez MRCP or ERCP testing, nor did he order Suárez surgery for his emergency medical conditions. *Id.* ¶ 192. As a result of this alleged inaction, Suárez suffered pain, nausea, and respiratory distress. *Id.* ¶¶ 124-25. Thereafter, Suárez's untreated conditions continued to worsen until he ultimately passed away. *Id.* ¶ 191. In sum, Plaintiffs' allegations that Suárez's suffering and death were due, in part, to Dr. Feliciano's failure to expedite or provide tests, surgery, or alternative treatment "is enough for this claim to cross from the realm of possibility to that of plausibility." *Velez*, at 351-52.

Accordingly, considering the instant motion, Plaintiffs have presented sufficient factual allegations against Dr. Feliciano to survive Movants' 12(b)(6) motion. Dr. Feliciano's request that the claims against him be dismissed for failure to state a claim is therefore **DENIED**.[9]

## V. Conclusion

For the reasons set forth above, Movants' Motion to Dismiss (**ECF No. 290**) is **DENIED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 23rd day of October 2023.

*/s/ María Antongiorgi-Jordán*
**MARIA ANTONGIORGI-JORDAN**
**UNITED STATES DISTRICT JUDGE**

---

[9] However, Dr. Feliciano is not foreclosed from raising this argument at later stages of this case if he so wishes. *See Sally Beauty Supply, LLC v. Caribbean Retail Ventures, Inc.*, 18-cv-1844, 2021 WL 5570325, at *1 (D.P.R. July 30, 2021) ("[A] motion to dismiss does not address whether a plaintiff will prevail, but whether they are entitled to support their claims further in proceedings.").