# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

|  |  |
|---|---|
| **AISLYN BATISTA ACEVEDO,** *et al.*,<br><br>    *Plaintiffs*,<br><br>v.<br><br>**PRESBYTERIAN COMMUNITY HOSPITAL INC.,** *et al.*,<br><br>    *Defendants*. | Civ. No. 22-01468 (MAJ) |

## OPINION AND ORDER

### I.     Introduction

On September 27, 2022, Plaintiffs Aislyn Batista Acevedo, Ina Ruth Kessler Krugman, and minor A.D.S.B. ("Plaintiffs") filed the instant suit on behalf of the late David Suárez ("Suárez") against Ashford Presbyterian Community Hospital ("Presby") and various other defendants ("Defendants"). (**ECF No. 1**).[1] From September 29, 2021, until his death on October 23, 2021, Suárez was hospitalized at Ashford Presbyterian Hospital and Doctors' Center Hospital Bayamón. Plaintiffs allege that, during the time that Suárez was hospitalized, Defendants failed to properly screen and treat Suárez in violation of the Emergency Medical Treatment and Labor Act ("EMTALA"). *See* 42 U.S.C. § 1395. Plaintiffs also allege that all Defendants are liable under Puerto Rico law for negligence and medical malpractice. (**ECF No. 288**).

---

[1]     Plaintiffs filed their Second Amended Complaint, now the operative Complaint, on May 18, 2023. (**ECF No. 288**).

Before the Court is a Motion in Limine filed by Defendants Pediatrix Medical Group of Puerto Rico ("Pediatrix"), Dr. Carlos Álvarez Ruiz ("Dr. Álvarez"), and Dr. Reynaldo Pezzotti Álvarez ("Dr. Pezzotti"). (**ECF No. 756 at 1**). Defendants move the Court to prohibit Plaintiffs from introducing expert witness testimony regarding the alleged negligence of Pediatrix, Dr. Álvarez, or Dr. Pezzotti. (**ECF No. 756 at 2**). Plaintiffs oppose the motion. (**ECF No. 782**). For the reasons that follow, the motion is **DENIED**.

## II. Background

According to the operative complaint,[2] Suárez was admitted to the emergency room at Presby on September 29, 2021. (**ECF No. 288 at 16 ¶ 107**). At that time, Suárez was complaining of acute abdominal pain. *Id*. Medical staff at the hospital ordered "an abdominal sonogram, some laboratory tests, pain medications and hydration[,]" as well as "a consultation with internal medicine and surgery services." (**ECF No. 288 at 16 ¶ 110**).

Early the next day, Suárez was evaluated by Dr. Cuff, a physician specializing in general surgery. (**ECF No. 288 at 5 ¶ 21, 16 ¶ 112**). Dr. Cuff determined that Suárez would need to undergo surgery, yet he decided that Suárez would first have to submit to an "MRCP" evaluation before surgery would be possible. (**ECF No. 288 at 17 ¶ 113**). By disputed means, medical staff at the hospital allegedly determined that Suárez was too obese to fit in the MRI machine used to conduct MRCP evaluations at Presby . (**ECF No.**

---

[2] The Court recites the following facts from the Complaint for the sole purpose of providing background on the controversy between the parties; the Court does not accept the allegations in the Complaint as true.

**288 at 17 ¶ 115**). Accordingly, on September 30, 2021, the physicians treating Suárez decided to transfer him to another hospital facility. (**ECF No. 288 at 18 ¶ 120**).

On October 1, 2021, Suárez was transferred to Doctors' Center Hospital Bayamón ("Doctors'"). By the next day, medical staff at that facility allegedly determined that they also would not be able to perform the necessary procedures on Suárez because their facilities could not accommodate his size. (**ECF No. 288 at 23–24 ¶¶ 155–156**). Medical staff at Doctors' thus decided to transfer Suárez back to Presby. (**ECF No. 288 at 24 ¶ 161**).

Over the course of the next two days, Suárez deteriorated. (**ECF No. 288 at 25–27 ¶¶ 163–176**). On October 4, 2021, Suárez was intubated. (**ECF No. 288 at 27 ¶ 176**). Several weeks later, on October 23, 2021, Suárez died. (**ECF No. 288 at 29–30 ¶ 191**).

Dr. Álvarez was the Emergency Room Director at Presby at the time that Suárez was hospitalized in that facility. (**ECF No. 657 at 7**). At that time, Dr. Álvarez was hired by Pediatrix, a professional services corporation who provided medical services at Presby. (**ECF No. 657 at 5, 7**).

Dr. Pezzotti was a physician in General Medicine at Presby at the time that Suárez was hospitalized in that facility. (**ECF No. 657 at 6**). At that time, Dr. Pezzotti was also hired by Pediatrix, a professional services corporation who provided medical services at Presby. (**ECF No. 657 at 5, 6**).

Plaintiffs allege that Suárez was treated by Dr. Pezzotti and Dr. Álvarez during the time that he was hospitalized at Presby. (**ECF No. 657 at 8**); (**ECF No. 288 at 10 ¶ 64**). In short, Plaintiffs allege that Dr. Pezzotti and Dr. Álvarez were among the physicians responsible for treating Suárez, and that they—along with all other physicians who were responsible for treating Suárez—were negligent by failing to ensure that he received

adequate treatment. *See* (**ECF No. 288 at 18 ¶ 121**) (alleging that, based on the medical record, "Dr. Cuff documented that he discussed the case with defendant Dr. Pezzotti, emergency room physician, and although it appears that defendant Dr. Pezzotti provided treatment to [Suárez] on September 30, 2021, there is neither a progress note in the medical record, nor a medical order from Dr. Pezzotti on that date."); (**ECF No. 288 at 18 ¶ 122**) (alleging that "defendant Dr. Álvarez informed [Suárez] that he was going to be transferred during the morning to [another] hospital[,]" and that "Dr. Álvarez did not document his intervention with the patient in the medical record"). As to Pediatrix, Plaintiffs proceed under a theory of respondeat superior. (**ECF No. 782 at 56**).

### III. Legal Standard

Before a party may admit testimony from an expert witness, Rule 26 of the Federal Rules of Civil Procedure requires that the party submit a written report containing, in relevant part, "a complete statement of all opinions the witness will express and the basis and reasons for them[,]" as well as "the facts or data considered by the witness in forming them[.]" FED. R. CIV. P. 26(a)(2)(B). Crucially, an expert witness may reasonably supplement, explain, or elaborate on the material set forth in their Rule 26 report. *Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 64 (1st Cir. 2011). However, where a party fails to comply with the mandatory disclosure requirements of Rule 26(a) and their failure was not "substantially justified or . . . harmless[,]" that "party is not allowed to use that information or witness to supply evidence . . . at a trial[.]" FED. R. CIV. P. 37(c)(1). The admissibility of expert witness testimony is thus contingent upon whether the parties "make explicit and detailed expert disclosures" that demonstrate the reliability and rigor of the proffered opinion. *Santiago-Díaz v. Laboratorio Clínico y de Referencia del Este*, 456 F.3d 272, 276 (1st Cir. 2006); *see also Clemente-Vizcarrondo v. United States*, Civ.

No. 17-1144, 2020 WL 748840, at *2 (D.P.R. Feb. 14, 2020); *Rivera-Marrero v. Presbyterian Cmty. Hosp.*, 255 F. Supp. 3d 290, 296 (D.P.R. 2017) ("[E]xpert-related disclosures are insufficient when they consist of sketchy and vague descriptions of anticipated opinions or areas of anticipated testimony.") (quotations omitted).

## IV. Analysis

With respect to Plaintiffs' expert witnesses Dr. Michael Quinn ("Dr. Quinn"), Dr. Eliot Goodman ("Dr. Goodman"), and Dr. Dainius Drukteinis ("Dr. Drukteinis"), Defendants invoke Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure and move the Court to prohibit each witness "from proffering any testimony or opinions as to the alleged negligence of Pediatrix, Dr. Álvarez and Dr. Pezzotti." (**ECF No. 756 at 2**). Defendants' argument is simple: because none of the Rule 26 reports produced in question expressly name Pediatrix, Dr. Álvarez, or Dr. Pezzotti, Defendants move the Court to prohibit the expert witnesses from offering any opinions at trial relating to the alleged negligence of Pediatrix, Dr. Álvarez, or Dr. Pezzotti. (**ECF No. 756 at 6–9**).

The Defendants' argument is premised on a misguided interpretation of Rule 26. FED. R. CIV. P. 26(a)(2)(B)(i) (requiring that an expert witness report contain "a complete statement of all opinions the witness will express and the basis and reasons for them"). There is no doubt that Rule 26 calls for "explicit and detailed expert disclosures." *Santiago-Díaz v. Laboratorio Clinico y de Referencia del Este and Sara López, M.D.*, 456 F.3d 272, 276 (1st Cir. 2006). Nevertheless, what constitutes a sufficiently "explicit and detailed" statement necessarily depends on the nature of the opinion in question: after all, some opinions may be of a more general nature. In this case, Plaintiffs claim that Presby and its staff were negligent by omitting to provide Suárez with the minimal care to

which he was entitled for his emergency condition. In that context, Plaintiffs seek to introduce expert witness testimony broadly concluding that (1) the standard of care required that Suárez be submitted to an MRCP evaluation, (2) that *all* medical staff responsible for the care of Suárez at Presby breached the standard of care omission, that is, by failing to provide him with the required treatment, and (3) that this caused the demise of Suárez. Where the Plaintiffs' theory of negligence is that *all* assigned medical staff at Presby breached the standard of care by omission, it makes little sense why Plaintiffs' experts would be required to restate this opinion separately with respect to each named Defendant. Indeed, Defendants have not provided any legal authority holding that a Rule 26 expert witness report must expressly articulate an opinion regarding the standard of care as to each individual Defendant with particularity, nor has the Court identified any such standard.

Upon careful review of the expert witness reports in question, the Court finds that they each provide an opinion regarding Dr. Álvarez and Dr. Pezzotti.[3] To the extent that any of Plaintiffs' expert witnesses attempt to offer an opinion at trial that specifically addresses the alleged negligence of Dr. Pezzotti or Dr. Álvarez, that opinion will not be excluded so long as it is a reasonable elaboration of the opinions set forth in their reports. *See Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 64 (1st Cir. 2011) (an expert witness may reasonably elaborate on the material set forth in their Rule 26 report).[4] To illustrate

---

[3]  On the other hand, the expert reports in question provide no opinion relating to Pediatrix. That is because Plaintiff proceeds against Pediatrix under a theory of respondeat superior: in other words, Plaintiffs do not accuse Pediatrix of negligence, but seek to recover from Pediatrix for the negligence of Dr. Pezzotti and Dr. Álvarez. (**ECF No. 782 at 56**). The fact that the expert reports in question do not address the conduct of Pediatrix is therefore of no consequence in this action.

[4]  The Court notes that none of the expert witnesses in question will testify as a lay witness at trial. *Compare* FED. R. EVID. 602 *with* FED. R. EVID. 703. It is therefore not for Dr. Quinn, Dr. Goodman, or Dr.

the fact that all three expert reports articulate a standard of care applicable to Dr. Pezzotti and Dr. Álvarez, the Court will address each expert report in turn.

### A. The Expert Witness Report of Dr. Michael Quinn

Dr. Quinn reports that, based on his review of the medical records in this case, Suárez should have received a "CT scan of the abdomen and pelvis" during the time that he was hospitalized at Presby, "yet no CT scan was obtained[.]" (**ECF No. 756-1 at 2**). In addition, Dr. Quinn states in the report that "the standard of care would have been for [Suárez] to undergo an urgent ERCP for further workup and management" before his discharge from the Hospital. (**ECF No. 756-1 at 4**). It is undisputed that no such examination was performed. Dr. Quinn went on to explain that, "to a high degree of medical probability[,]" Suárez had "acute pancreatitis" at the time that he was hospitalized at Presby and "needed an urgent ERCP" examination. (**ECF No. 756-1 at 4**). In addition, Dr. Quinn concluded, "[t]he fact that [Suárez] had not had a formal consultation with a gastroenterologist at Ashford [Presbyterian Hospital] by 10/1/21" constituted "a deviation from the standard of care." (**ECF No. 756-1 at 4–5**). Furthermore, upon his return to Ashford Presbyterian Hospital after a temporary transfer to Doctors' Center Hospital, Suárez declined rapidly due to the fact that his condition "was not properly managed with an urgent ERCP[,]" according to Dr. Quinn. (**ECF No. 756-1 at 5–6**).

---

Drukteinis to establish whether either Dr. Álvarez and Dr. Pezzotti were actually involved in the treatment that Suárez received. However, assuming that Plaintiffs do present evidence to the jury that Dr. Álvarez and Dr. Pezzotti were charged with the care of Suárez during his stay at Ashford Presbyterian Hospital, the expert witness testimony in question will assist the trier of fact in determining whether Dr. Álvarez and Dr. Pezzotti breached the standard of care by allegedly failing to order the proper tests and make the proper referrals to evaluate and treat Suárez.

In summary, Dr. Quinn provided in his report that the medical staff at Presby responsible for the care of Suárez breached the standard of care by failing to refer him to a gastroenterologist and by failing to conduct an ERCP for the evaluation and treatment of Suárez.

### B. The Expert Witness Report of Dr. Eliot Goodman

Dr. Goodman stated expressly in his report that some of his opinions were "general" in that they related "to the overall collective treatment of the patient[,]" whereas other opinions provided in his report related only to the conduct of specific physicians involved in the treatment of Suárez. (**ECF No. 756-2 at 5**). Among those "general" conclusions, Dr. Goodman stated that, when Suárez was admitted to Presby, it was "vital" given his condition that he be "fully evaluated with MRCP and/or ERCP." *Id*. "If an MRCP cannot be performed," Dr. Goodman continued, "then a diagnostic ERCP . . . must be performed." (**ECF No. 756-2 at 6**). According to Dr. Goodman, therefore, "the *healthcare providers* at Presby deviated from the standard of care when they failed to make a proper assessment of the facility's ability to perform an MRCP on the patient." *Id*. (emphasis added). Based on his review of the medical record, Dr. Goodman explained, it appeared that "none of the physicians caring for the patient at Ashford on 9/30/2021 fully investigated for themselves whether the patient could fit on the MRI table" such that he could undergo an MRCP evaluation. *Id*. In addition, Dr. Goodman's report identifies a second breach of the standard of care where it concludes that "the handling of the transfer of the patient from Ashford to Doctors' Center Hospital on 10/01/2021 was poorly executed. This was a deviation from the standard of care. Although there was some degree of communication between Dr. Cuff, Dr. Pezzotti, Dr. Ramos and Dr. Morales Solis, the

sum of this communication did not add up to a technically proficient initiation of the transfer[.]" *Id*. As Dr. Goodman summarized the "general" findings of his report,

> [M]y general criticisms of the management of this patient at both Ashford and Doctors' Center Hospital focus on deviations in the standard of care in regards to the failure to correctly assess the patient's body habitus when considering the ability of both facilities to accommodate him on the MRI or operating room table. My other general criticism is that the miscommunication between the various doctors at Ashford and Doctors' Center Hospital led to a situation where the patient was transferred . . . without the proper protocol being followed.

(**ECF No. 756-2 at 7**). Dr. Goodman did not hesitate to ascribe a causal relationship between such deviations from the standard of care and the eventual death of Suárez: "The failures to meet the standard of care as described above by physicians at Ashford and Doctors' Center Hospital allowed the patient's common bile duct stone pathology and acute biliary pancreatitis to rapidly evolve . . . Unfortunately, this cascade of inflammatory events led to the patient developing refractory multiorgan failure which then ultimately caused the patient's demise[.]" (**ECF No. 756-2 at 8**).

### C. The Expert Witness Report of Dr. Dainius Drukteinis

In his expert witness report, Dr. Drukteinis concluded that the "[s]tandard of care . . . when choledocholithiasis is suspected but not confirmed . . . is to perform additional testing" with an MRCP or ERCP, (**ECF No. 756-3 at 11**),[5] and ultimately opined that the "treatment team" at Ashford Presbyterian Hospital "failed to diagnose and definitively treat" Suárez. (**ECF No. 756-3 at 12**).

---

[5] Dr. Drukteinis provided this assessment immediately after addressing in detail the "chain of responsibility" – i.e. the sequence by which various defendants cared for Suárez in turn – and included specific references to Dr. Pezzotti and Dr. Álvarez. (**ECF No. 756-3 at 7-9**).

In addition, Dr. Drukteinis opines in his report that "[t]ransitions of care . . . also known as handoffs . . . are performed between emergency medicine providers between every change of shift. Poor transitions of care between medical providers within an emergency department are known to lead to critical errors in patient management." *Id.* Dr. Drukteinis states in his report that *all* assigned physicians at Ashford Presbyterian Hospital had failed to meet the standard of care with respect to "transitions of care":

> The Ashford Presbyterian physicians also exhibited significant delays in attempting to perform (or not perform) an MRCP, delays in following up the results of the MRCP (or lack thereof), delays in assessing why the MRCP could not be performed (including the confirmed weight and habitus of Mr. Suarez Kessler, the confirmed limitations of the MRI machines and the confirmed limitations of the operating room tables at each hospital), and delays in the decision and initiation of Mr. Suarez Kessler ultimate transfer to another hospital. These delays were due to communication problems between the emergency department physicians, the consults, and the radiology department. Based on the surprising times involved, there appears to have been an apparent lack of urgency in the general management of Mr. Suarez Kessler and/or lack of interest of a provider in championing and directing his care.

(**ECF No. 756-3 at 13**).

Dr. Drukteinis also opined that "[p]atients who have emergency medical condition[s] in general may not be transferred from a hospital with the capabilities to manage a patient." (**ECF No. 756-3 at 12**). With respect to the decision to transfer Suárez to Doctors' Center Hospital Bayamón, Dr. Drukteinis concluded that staff at Ashford Presbyterian Hospital should have confirmed that Doctors' Center Hospital Bayamón had the proper capacity to accommodate the patient before initiating the transfer. *Id.*

These conclusions are broadly applicable to all medical staff that were responsible for the treatment of Suárez during his stay at Ashford Presbyterian Hospital. As Dr. Drukteinis summarized,

> [Suárez] spent forty-four hours, five full emergency department shifts, and 6 emergency department physician interactions at Ashford Presbyterian before he was transferred . . . There is no reasonable justification for delaying imaging studies, calling specialty consultants, or arranging a transfer, if transfer was needed at all. **Each emergency department attending who began their shift should have been aware of [Suárez's] presence in their own department, should have realized the lack of a prompt and adequate disposition for [Suárez], and should have been concerned about the course of his condition**.

(**ECF No. 756-3 at 13**) (emphasis added).

### III. Conclusion

After careful consideration, the Court finds that the expert witness reports in question identify a standard of care applicable to the movants. As such, the expert witnesses will be permitted at trial to offer testimony as to Dr. Pezzotti and Dr. Álvarez to the extent such testimony reasonably elaborates on the material set forth in the expert reports. *See Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 64 (1st Cir. 2011) (testimony that differs from that which was presented in an expert witness report is admissible where it is but "a reasonable elaboration of the opinion disclosed in the report."). Accordingly, the instant Motion in Limine is **DENIED**.

It is so **ORDERED**.

In San Juan, Puerto Rico, this 6th day of February, 2026.

*s/ María Antongiorgi-Jordán*
**MARIA ANTONGIORGI-JORDAN**
**UNITED STATES DISTRICT JUDGE**
