# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **AISLYN BATISTA ACEVEDO**, *et al.*,<br><br>   *Plaintiffs*,<br><br>v.<br><br>**PRESBYTERIAN COMMUNITY HOSPITAL INC.**, *et al.*,<br><br>   *Defendants*. | Civ. No. 22-01468 (MAJ) |

## OPINION AND ORDER

### I. Introduction and Background

On September 27, 2022, Plaintiffs Aislyn Batista Acevedo, Ina Ruth Kessler Krugman, and minor A.D.S.B. ("Plaintiffs") filed the instant suit on behalf of the late David Suárez ("Suárez") against nurse practitioner Luis Roa Cordero ("Roa") and various physicians, hospitals, service providers, and their insurers (collectively, "Defendants"). (**ECF No. 1**). From September 29, 2021, until his death on October 23, 2021, Suárez was hospitalized at Ashford Presbyterian Hospital ("Presby") and Doctors' Center Hospital Bayamón ("Doctors'"). Plaintiffs allege that, during the time that Suárez was hospitalized, Defendants failed to properly screen and treat Suárez in violation of the Emergency Medical Treatment and Labor Act ("EMTALA"). *See* 42 U.S.C. § 1395. Plaintiffs also allege that all Defendants are liable under Puerto Rico law for negligence and medical malpractice. (**ECF No. 288**).

Before the Court is a Motion in Limine filed by Roa, Suzette Betancourt-Reyes, and their conjugal partnership, who request that the Court prohibit Plaintiffs from introducing expert witness testimony regarding the alleged negligence of Roa from

Plaintiffs' experts Dr. Michael Quinn ("Dr. Quinn"), Dr. Elliot Goodman ("Dr. Goodman"), and Dr. Dainius A. Drukteinis ("Dr. Drukteinis") (collectively, "Plaintiffs' Experts"). (**ECF No. 742**). For the reasons that follow, the motion is **GRANTED**.

## II. Factual Background

According to the operative complaint,[1] Suárez was admitted to the emergency room at Presby on September 29, 2021. (**ECF No. 288 at 16 ¶ 107**). At that time, Suárez was complaining of acute abdominal pain. *Id*. Medical staff at the hospital ordered "an abdominal sonogram, some laboratory tests, pain medications and hydration[,]" as well as "a consultation with internal medicine and surgery services." (**ECF No. 288 at 16 ¶ 110**).

Early the next day, Suárez was evaluated by Dr. Cuff, a physician specializing in general surgery. (**ECF No. 288 at 5 ¶ 21, 16 ¶ 112**). Dr. Cuff determined that Suárez would need to undergo surgery, yet he decided that Suárez would first have to submit to an "MRCP" evaluation before surgery would be possible. (**ECF No. 288 at 17 ¶ 113**). By disputed means, medical staff at the hospital allegedly determined that Suárez was too obese to fit in the MRI machine used to conduct MRCP evaluations at Presby. (**ECF No. 288 at 17 ¶ 115**). Accordingly, on September 30, 2021, the physicians treating Suárez decided to transfer him to another hospital facility. (**ECF No. 288 at 18 ¶ 120**).

On October 1, 2021, Suárez was transferred to Doctors'. By the next day, medical staff at that facility allegedly determined that they also would not be able to perform the necessary procedures on Suárez because their facilities could not accommodate his size.

---

[1] The Court recites the following facts from the Complaint for the sole purpose of providing background on the controversy between the parties; the Court does not accept the allegations in the Complaint as true.

(**ECF No. 288 at 23–24 ¶¶ 155–156**). Medical staff at Doctors' thus decided to transfer Suárez back to Presby. (**ECF No. 288 at 24 ¶ 161**).

Over the course of the next two days, Suárez deteriorated. (**ECF No. 288 at 25–27 ¶¶ 163–176**). On October 4, 2021, Suárez was intubated. (**ECF No. 288 at 27 ¶ 176**). Several weeks later, on October 23, 2021, Suárez died. (**ECF No. 288 at 29–30 ¶ 191**).

Roa was the nurse practitioner who performed the initial emergency room assessment of Suárez at Doctors' on October 1, 2021. (**ECF No. 288 at 21 ¶ 144**). Plaintiffs allege that, in his evaluation of Suárez, Roa noted "fatigue, malaise, jaundice, abdominal pain, nausea, vomiting, gallbladder disease, hematuria, headache, anxiety, acutely ill, and positive Murphy's sign." (**ECF No. 288 at 22 ¶ 147**). His clinical impression was that Suárez had pancreatitis due to common bile duct stone. (**ECF No. 288 at 22 ¶ 147**). Roa stated that he would start treatment for Suárez and order consultations with the emergency room physician. (**ECF No. 288 at 22 ¶ 146**). He also suggested a consultation with surgery, ordered laboratory tests on Suárez, and handed off care of the patient to Dr. Rivera. (**ECF No. 288 at 22 ¶¶ 146; 150**). Plaintiffs allege that no surgery, gastroenterology, or internal medicine services were consulted despite Roa's request. (**ECF No. 288 at 24 ¶ 158**).

### III. Legal Standard

The admission of expert testimony is governed by Federal Rule of Evidence 702, which provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

>    (d)     the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. Rule 702 directs the court to consider the admissibility of expert testimony by determining whether "an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Carrozza v. CVS Pharmacy, Inc.*, 992 F.3d 44, 55–56 (1st Cir. 2021) (quoting *Daubert*, 509 U.S. at 597).

Before a party may admit testimony from an expert witness, Rule 26 of the Federal Rules of Civil Procedure requires that the party submit a written report containing, in relevant part, "a complete statement of all opinions the witness will express and the basis and reasons for them[,]" as well as "the facts or data considered by the witness in forming them[.]" FED. R. CIV. P. 26(a)(2)(B). An expert witness may reasonably supplement, explain, or elaborate on the material set forth in their Rule 26 report. *Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 64 (1st Cir. 2011). However, where a party fails to comply with the mandatory disclosure requirements of Rule 26(a) and their failure was not "substantially justified or . . . harmless[,]" that "party is not allowed to use that information or witness to supply evidence . . . at a trial[.]" FED. R. CIV. P. 37(c)(1). The admissibility of expert witness testimony is thus contingent upon whether the parties "make explicit and detailed expert disclosures" that demonstrate the reliability and rigor of the proffered opinion. *Santiago-Díaz v. Laboratorio Clínico y de Referencia del Este*, 456 F.3d 272, 276 (1st Cir. 2006); *see also Clemente-Vizcarrondo v. United States*, Civ. No. 17-1144, 2020 WL 748840, at *2 (D.P.R. Feb. 14, 2020); *Rivera-Marrero v. Presbyterian Cmty. Hosp.*, 255 F. Supp. 3d 290, 296 (D.P.R. 2017) ("[E]xpert-related disclosures are insufficient when they consist of sketchy and vague descriptions of anticipated opinions or areas of anticipated testimony.") (quotations omitted).

### IV. Analysis

Roa challenges the admissibility of Plaintiffs' Experts' testimony as to Roa on the grounds that all of Plaintiffs' Experts fail the *Daubert-Kumho* standard, as none establish (i) the applicable standard of care to Roa as a nurse practitioner in an Emergency Room, [(ii)] any deviation by Roa, specifically, of said standard, or (iii) the causal nexus between Roa's actions or omissions and the damages suffered." (**ECF No. 742 at 12**).[2] Because the Court finds that Plaintiffs' Experts' reports do not discuss any standard of care applicable to Roa, the Court concludes that Plaintiffs' Experts may not testify as to the standard of care applicable to Roa or his deviations from such standard.

While all three expert opinions speak to the standard of care faced by physicians and/or medical institutions, nurses are subject to a distinct standard of care under Puerto Rico law in light of their distinct roles and responsibilities. "As to the standard of care owed specifically by nurses, the Puerto Rico Supreme Court has held that '[a] nurse should exercise a certain standard of reasonable care to see that no unnecessary harm comes to the patient, and said standard of care must be the same as the standard of care exercised by other nurses in the locality or similar localities.'" *Morales v. Monagas*, 723 F.Supp.2d 416, 422 (D.P.R. 2010) (quoting *Blas Toledo v. Hospital Nuestra Señora de la Guadalupe*, 146 D.P.R. 267, 207, slip op. at 21 (1998)); *see also Castro v. Municipio de Guánica*, 87 D.P.R. 725, 728–29 (1963). Additionally, "[n]urses have the unavoidable

---

[2] Roa challenges the admissibility of Plaintiffs' Experts' testimony as to Roa on several additional grounds, including that they lack accepted methodologies, offer factual conclusions, offer legal conclusions, and opine on ultimate issues of liability. (**ECF No. 742**). Because the Court finds that Plaintiffs expert witnesses have failed to identify a reliable standard of care, none of the expert witnesses will be permitted to present testimony regarding the alleged negligence of Roa. *See Daubert*, 509 U.S. at 597 (requiring that, as a precondition for admissibility, expert witness testimony "both rests on a reliable foundation and is relevant to the task at hand.") Accordingly, these additional grounds for excluding the expert witness testimony are moot and will not be addressed by the Court.

duty to fulfill medical orders with the required urgency and in accordance with each patient's particular circumstances." *Morales*, 723 F.Supp.2d at 422.

Plaintiffs argue that "Dr. Drukteinis, Dr. Goodman, and Dr. Quinn each address specific departures from accepted emergency and hospital-based care that fall squarely within the scope of a nurse practioner functioning in the emergency department." **(ECF No. 782 at 31**). After a careful review of the expert reports, the Court finds that they provide no commentary whatsoever as to the proper function of a nurse practitioner in an emergency department and no basis to properly assist the jury in determining whether Roa deviated from a standard of care applicable to him.

With respect to Dr. Goodman, Plaintiffs highlight testimony that "it is vital that a patient who presents with a clinical and biochemical picture of biliary obstruction and acute pancreatitis has his common bile duct fully evaluated with MRCP and/or ERCP . . . that is the standard of care." (**ECF No. 782 at 32**). No portion of Dr. Goodman's report, however, gives any indication that, according to the prevailing "standard of care exercised by other nurses in the locality or similar localities[,]'" it is incumbent upon the nurse practitioner to possess this medical knowledge, much less that the prevailing standard of care requires nurse practitioners to ultimately ensure that the procedures take place notwithstanding the decisions of their physician supervisors. *Monagas*, 723 F.Supp.2d at 422. The report does not indicate what, if any, responsibility a nurse has to ensure this course of treatment is followed. Other points in Goodman's report identified by Plaintiffs as establishing a standard of care as to Roa concern issues in which Roa is not alleged to have had any role. (**ECF No. 782 at 33**).

With respect to Dr. Quinn, the expert report similarly is silent as to the role of the nurse practitioner. (**ECF No. 742-1**). For example, Dr. Quinn states that "[t]he fact that

David had not had a formal consultation with a gastroenterologist at Ashford or Doctors by 10/1/21 despite Dr. Morales being notified of David's case by Dr. Ramos, is a deviation from the standard of care. Furthermore, the fact that an ERCP could have been performed at Ashford or Doctors, but was not, was a deviation from the standard of care." (**ECF No. 742-1 at 4–5**). Dr. Quinn does not, however, indicate to any degree whether a nurse practitioner is responsible for ensuring that a consultation with a gastroenterologist takes place or that an ERCP is performed. Indeed, Dr. Quinn explicitly presents himself as being "familiar with the accepted standard of care for the *average qualified gastroenterologist* providing care and treatment to patients in 2021 to the present." (**ECF No. 742-1 at 1**) (emphasis added). Dr. Quinn's report therefore provides no basis to allow testimony as to the standard of care of a nurse practitioner in Puerto Rico.

With respect to Dr. Drukteinis, Plaintiffs assert that "[w]hen Dr. Drukteinis establishes the 'Standard of Care in the Emergency Department for a Patient with Suspected Choledocholithiasis' and the 'Standard of Care in the Emergency Department for Patient's Handoffs', he includes Roa in those standards." (**ECF No. 782 at 31**). To the contrary, Dr. Drukteinis explicitly qualified his enumeration of the standard of care as pertaining to physicians: "When a patient presents with suspected choledocholithiasis to the emergency department, the goal of the emergency medicine *physician* is to arrange confirmation of the diagnosis with imaging." (**ECF No. 742-3 at 11**) (emphasis added). Additionally, Dr. Drukteinis' discussion of deviations from the standard of care with

respect to patient handoffs are likewise directed at physicians.³ While the report summarily states that "the physicians and staff at both Ashford Presbyterian Community Hospital and Doctors' Center Hospital fell below the standard of care in their management of Mr. David Suarez Kessler and failed to adhere to EMTALA requirements," this conclusory assertion alone does not assist the jury with any standard by which to evaluate the actions of Roa.

Because Plaintiffs' Experts' reports do not speak to the standard of care of a nurse practitioner, Federal Rule of Civil Procedure 26 dictates that Plaintiffs' Experts cannot testify as to the standard of care applicable to Roa or his deviation from that standard. *See Rodríguez Perez v. Abreu Garcia*, 2024 WL 808654, at *3 (D.P.R. Feb. 27, 2024) ("[T]he Court will not permit [Plaintiffs] to circumvent the discovery and disclosure process by allowing [Plaintiffs' Experts] to testify beyond the bounds of [their] expert report[s].").⁴

### V.     Conclusion

After careful consideration, the Court finds that Plaintiffs' Experts do not provide a basis to offer any testimony as the alleged negligence of Roa. As such, Roa's Motion in Limine is **GRANTED**.

---

³   *See id*. at 14 ("The Doctors' Hospital *physicians* also exhibited significant delays in attempting to perform (or not perform) an ERCP, delays in assessing why the ERCP could not be performed (including the confirmed weight and habitus of Mr. Suarez Kessler, and the confirmed limitations of the operating room tables at each hospital), delays due to management from the emergency department director's home rather than the hospital, delays in use of proper consult channels to reach the gastroenterologist, delays in the gastroenterologist returning the consult, and delays in the decision and initiation of Mr. Suarez Kessler's ultimate transfer to another hospital. These delays were also due to communication problems between the *emergency department physicians*, the medical director, and the gastroenterologist.") (emphasis added); *id*. at 15 ("Each emergency department *physician* should have been aware of Mr. Suarez Kessler's presence in their department and concerned that he was not yet dispositioned by the end of each of their shifts.") (emphasis added).

⁴   The Court notes, however, that with respect to their opinions regarding other defendants in this case, Plaintiffs' Experts may discuss the facts of Roa's involvement in the treatment of Suárez, to the extent that those facts are relevant.

It is hereby **ORDERED**.

In San Juan, Puerto Rico, this 10th day of February, 2026.

                                      **/s/ María Antongiorgi-Jordán**
                                      **MARIA ANTONGIORGI-JORDAN**
                                      **UNITED STATES DISTRICT JUDGE**